UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| INTERNATIONAL ZINC COATINGS | ) | |
| & CHEMICAL CORP., | ) | No. 06 B 1373 |
| | ) | |
| Debtors. | ) | Judge Goldgar |

### MEMORANDUM OPINION

Before the court for ruling is the amended motion of debtor International Zinc Coatings & Chemical Corporation ("Zinc") to dismiss its own chapter 7 case. The original motion was filed within days of the bankruptcy's commencement last February, but a decision was delayed by the heated battle that arose over whether the motion should be granted.

That battle has raged between two creditor camps, with Zinc content to sit on the sidelines. One camp – Trinity Marine Products, Inc., Trinity Industries, Inc. (collectively "Trinity"), and Polyset Company, Inc. ("Polyset") – opposes dismissal. The other camp – Waxler Transportation Company, Marquette Transportation Co., Inc., and Iowa Fleeting Services, Inc. (collectively "Waxler") – supports dismissal. The chapter 7 trustee has not formally weighed in, but comments she has made in court suggest she believes dismissal would be reasonable given the vacuous nature of Zinc's bankruptcy estate.

After careful consideration of the record and the parties' arguments, the court concludes that the interests of the debtor and all creditors – including Trinity and Polyset – will be better served if the case is dismissed. For the reasons that follow, Zinc's amended motion will be granted, and the case will be dismissed pursuant to 11 U.S.C. § 305(a)(1).

## 1. Facts

The following facts are drawn from Zinc's petition and schedules; the parties' briefs and exhibits (including a transcript of the section 341 meeting and the decision in *Marquette Transp. Co., et al. v. Trinity Marine Prods., Inc., et al.*, Nos. 06-826, 06-827, 06-1281, 06-1282 (E.D. La. Aug. 11, 2006)); transcripts of status hearings in this case; the letter filed with this court by the Delaware Attorney General dated September 26, 2006, along with attachments; and the district court's docket in litigation transferred here from the Eastern District of Louisiana. Despite this disparate collection of sources, no facts are in dispute. No party has requested an evidentiary hearing, nor has any party suggested that one would be appropriate or useful.

Zinc was engaged in business as a private label distributor of zinc silicate coatings. The coatings were meant to be used as a kind of primer to protect steel in industrial and marine settings. One of the coatings Zinc distributed was a wax-based coating called "Duro-Seal" intended to prevent corrosion in boats, including barges.

Zinc is – or was, depending on one's point of view – a Delaware corporation with its principal place of business originally in New York. Gregg and Eric Falberg were Zinc's president and secretary, respectively, as well as its two directors. Between them, they also owned 92% of the shares of the corporation. Twenty-two other shareholders owned the remaining 8%.

Zinc did business from 1993 until 1997. In July 1997, Zinc sold its assets to Valspar Corporation for roughly $5 million. About 65% of the sale proceeds were paid to Zinc and presumably were distributed to Zinc's shareholders; the other 35% were put in escrow with a Minnesota bank to resolve any potential claims. No claims were made, however, and the money was disbursed to Zinc in two installments, one in 1998, the other in 1999. In early 2000, these funds were distributed to the shareholders. It appears that Zinc made no payments to anyone

after 2000 and has had no assets other than the escrowed funds since 1998 or 1999.

In 2000, following the disbursement of the remaining sale proceeds, Zinc sought to dissolve as a corporation, and the board passed a resolution to that effect. Well before the resolution was passed, possibly in 1998, Zinc sent out a letter to shareholders indicating that the corporation would be dissolved. A letter was also sent to creditors notifying them of the asset sale to Valspar and the proposed dissolution. It is unclear whether there was ever a formal meeting at which the shareholders voted on dissolution.

On December 29, 2000, Zinc delivered to the Delaware Secretary of State a document entitled "Short Form Certificate of Dissolution Before The Issuance of Shares Pursuant to Sections 274 and 391(A)(5)(ii)." The certificate asserted that "the corporation has no assets and has ceased transacting business." It also asserted that "no shares of stock of the corporation have been issued." The Secretary of State filed the certificate at 9:00 a.m. on December 29, 2000. The records of the Secretary of State show Zinc's corporate status as "surrendered."

More than two years later, in March 2003, Marquette Transportation and Iowa Fleeting filed a products liability action against Trinity, Polyset, and others, including Zinc, in Louisiana state court. In October 2003, Waxler Transportation filed its own action against Trinity, Zinc, and others in Louisiana state court. These actions alleged that Duro-Seal promoted corrosion instead of preventing it, and that 3,000 of Waxler's river barges had been damaged after Duro-Seal's application. Two other products liability actions had also been filed against Trinity in Louisiana state court, one by ACF Acceptance Barge I, LLC, the other by Florida Marine Transporters. In each of the four actions, Trinity asserted cross-claims and third party complaints against Zinc before the end of 2003.

Although the Falbergs believed Zinc was long dissolved and had no assets, they elected to

defend the Louisiana actions. They felt it was somehow not right to let default judgments be entered, especially since in their view none of the Duro-Seal that Zinc had distributed was involved. They thought they would be able to dispose of the litigation quickly.

Three years later, Zinc was still embroiled in the actions, and the Falbergs had spent a good deal more on Zinc's defense than they had anticipated. On February 15, 2006, Zinc sought relief in this court under chapter 7 of the Bankruptcy Code. The sole purpose of the bankruptcy, according to Gregg Falberg, was to stop the flow of attorneys' fees in the Louisiana cases. "[W]e had one objective," he testified at the section 341 meeting, "which is still our objective[:] . . . to not pay any more lawyers any more money." The bankruptcy was filed in this district, it appears, only because one or both of the Falbergs now live here and knew a lawyer here who would file the petition. Zinc itself has no other connection with Illinois.

On March 3, 2006, less than three weeks after filing bankruptcy, Zinc moved to dismiss the case. Although the details have never been clear, it appears Zinc reached an agreement of some kind with Waxler under which Waxler would drop Zinc as a defendant in the two Waxler actions. (This agreement would have no effect on the other two actions, but the Falbergs were unconcerned: Gregg Falberg testified that "we didn't sell the paint there" and so "we don't really consider a liability there.")

Meanwhile, on February 16, 2006, the day after Zinc filed its petition, Trinity took advantage of the bankruptcy filing to remove the Waxler products liability actions to the district court in Louisiana, asserting federal jurisdiction under 28 U.S.C. § 1334(b) on the theory that the actions were "related to" the bankruptcy case. Less than a week later, Trinity moved to transfer the actions to this district. In March 2006, Polyset removed the other two actions to the district court, where all four actions were consolidated.

-4-

In August 2006, the district court in Louisiana granted Trinity's motion, denied a motion from Waxler to remand, and transferred all four actions to Illinois. (All four actions were transferred although Polyset did not move for a transfer, and according to the August 2006 transfer order, the other two actions seem to have been settled.) The four actions are currently pending before the district court here, where Waxler has renewed its remand motion.

In the interim, briefing continued on Zinc's amended motion to dismiss the bankruptcy case, with Waxler arguing (among other things) that Zinc had no power to file bankruptcy in 2006 because it had dissolved in 2000 and its wind-up period had ended in 2003. Because the certificate Zinc filed purporting to dissolve under section 274 seemed to present questions of first impression under Delaware corporate law, in late August this court issued an order identifying the questions and inviting the Attorney General of Delaware to submit an amicus brief.

Four days later, Gregg Falberg, in his capacity as president of Zinc, executed a "Corrected Certificate" attaching a new "Short Form Certificate of Dissolution." This certificate identified dissolution as having taken place pursuant to section 275 of the Delaware law, not section 274. It also stated that dissolution had been "authorized by the Board of Directors and stockholders on December 29, 2000." The certificate was delivered to the Delaware Secretary of State on September 5, 2006, and filed the same day.

On September 26, 2006, the Delaware Attorney General filed a letter with this court in response to the invitation to serve as *amicus curiae*. In the letter, the Attorney General declined to address the questions posed, noting that his office "does not generally opine on substantive matters of corporate law." Nevertheless, he said, he had obtained information that might aid the court's decision. The Attorney General noted that Zinc had filed the certificate of correction, and that under Del. Code Ann. tit. 8, § 103(f) such a certificate ordinarily "relates back to the filing

date of the original instrument, and the correction is deemed to have been effective at that time." He added, however, that he could not say whether Zinc had followed the procedures under section 275, nor could he say whether the correction had adversely affected anyone.

## 2. Analysis

Section 305(a)(1) of the Bankruptcy Code permits the court to dismiss a case or suspend all proceedings if "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1). The provision offers no guidance on what those interests are, what might better serve them, or when those interests would be better served by dismissal rather than suspension. *In re Spade,* 258 B.R. 221, 228 (D. Colo. 2001). Whether to dismiss or suspend under section 305(a)(1) is consequently a discretionary decision to be made on a case-by-case basis. *In re Fortran Printing, Inc.,* 297 B.R. 89, 94 (Bankr. N.D. Ohio 2003); *see also In re 801 S. Wells St. L.P.,* 192 B.R. 718, 723 (Bankr. N.D. Ill. 1996).

In making this fact-sensitive determination, courts consider a wide range of factors. The many lists mentioned in the decisions vary, but typically they include the following: (1) the presence of unsettled issues of non-bankruptcy law; (2) the availability of another forum to decide those issues; (3) economy and efficiency of administration; (4) any prejudice to the parties; and (5) the purpose of the bankruptcy. *See, e.g., In re St. Marie Dev. Corp. of Mont., Inc.,* 334 B.R. 663, 672 (Bankr. D. Mont. 2005); *Fortran,* 297 B.R. at 94; *In re Realty Trust Corp.,* 143 B.R. 920, 926 (Bankr. D. N. Mar. I. 1992). Other factors sometimes considered include the nature of the estate's assets and the motivations of the parties. *Spade,* 258 B.R. at 231; *In re Jr. Food Mart of Ark., Inc.,* 241 B.R. 423, 426 (Bankr. E.D. Ark. 1999).

Dismissal under section 305(a)(1) is considered "an extraordinary remedy." *Fortran,* 297

B.R. at 94. Great care must be shown in exercising the court's discretion, particularly given the limited review of a decision to dismiss under that section. *In re Luftek, Inc.*, 6 B.R. 539, 548 (Bankr. E.D.N.Y. 1980). Section 305(a)(1) dismissals are meant to be "the exception rather than [the] rule." *Id.* Nevertheless, dismissal is appropriate when it will best serve the interests of the debtor and creditors. *Fortran*, 297 B.R. at 94.

In this case, Zinc simply asserts in its amended motion that dismissal would best serve those interests and gives no explanation why. Waxler, however, amplifies on the motion, arguing that the case should be dismissed for two reasons. First, Waxler contends that Zinc was dissolved in 2000 and so had no ability to file bankruptcy in 2006 – a contention that really falls under section 707(a), not section 305(a)(1).[1/] Second, Waxler argues that because Zinc is out of business and has no assets, the case serves no legitimate bankruptcy purpose. Trinity and Polyset oppose dismissal, Waxler says, only because the bankruptcy case is keeping the products liability actions out of Louisiana, a forum where these parties have fared badly.

### a. The Debtor's Capacity to File Bankruptcy

The corporate dissolution argument, though superficially attractive, turns out to raise difficult questions of Delaware corporate law and federal bankruptcy law.

With limited exceptions, section 109(b) of the Code permits a "person" to be a debtor in a

---

[1/]    In their briefs, Waxler and Trinity assume Zinc has moved for dismissal under section 707(a), which permits dismissal of a chapter 7 case for "cause." 11 U.S.C. § 707(a). Zinc, though, never specified the provision under which it was seeking dismissal. Zinc did, however, paraphrase section 305(a)(1) in both the original and amended motions, asserting that dismissal would be "in the interest of both Debtor and all creditors." Despite their extensive discussion of section 707(a), Waxler and Trinity also address in their briefs the considerations relevant to dismissal under section 305(a)(1). Given that Zinc appears to have sought dismissal under that section, that the parties have briefed the question, and that dismissal under section 305(a)(1) is warranted, the court construes Zinc's motion as one under section 305(a)(1).

chapter 7 case. 11 U.S.C. § 109(b). Under section 101(41), a "person" includes a "corporation." 11 U.S.C. § 101(41). "Corporation," in turn, is defined broadly in section 101(9) to include a wide variety of business and non-business entities. 11 U.S.C. § 101(9). The Code, however, does not address whether a dissolved corporation can be a debtor – or, for that matter, when a corporation is dissolved. State law governs those questions. *See Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.*, 302 U.S. 125, 127-28 (1937); *In re StatePark Bldg. Group, Ltd.*, 316 B.R. 466, 472 (Bankr. N.D. Tex. 2004); *In re Segno Commc'ns, Inc.*, 264 B.R. 501, 507 (Bankr. N.D. Ill. 2001). Because Zinc was incorporated in Delaware, Zinc's ability to be a debtor therefore depends on Delaware law.

If Zinc dissolved in 2000, plainly it could not file a bankruptcy case in 2006. Section 278 of the Delaware General Corporation Law extends the life of an otherwise dissolved corporation for an additional three years, but only for

> the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized.

Del. Code Ann. tit. 8, § 278; *see generally City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1195 (Del. 1993). Once the three-year period expires, however, the corporation ceases to exist – even for purposes of winding up. *In re Citadel Indus., Inc.*, 423 A.2d 500, 503 (Del. Ch. 1980). An exception is made only for an "action, suit or proceeding begun by or against the corporation" before or during the wind-up period which, section 278 says, "shall not abate." Del. Code Ann. tit. 8, § 278.

If Zinc dissolved in 2000, then, the wind-up period would have continued until 2003 but

-8-

not beyond. Before 2003, Zinc could have filed a chapter 7 bankruptcy case. *Cf. First Nat'l Bank of Liberal v. Liberal Mack Sales, Inc. (In re Liberal Mack Sales, Inc.)*, 24 B.R. 707 (Bankr. D. Kan. 1982) (holding under Kansas statute identical to Delaware wind-up provision that dissolved corporation could be debtor in involuntary chapter 7 case filed during wind-up period). After 2003, however, Zinc would no longer have existed for any purpose and so would have had no power to file bankruptcy. *See, e.g., In re American Heartland Sagebrush Sec. Inves., Inc.*, 334 B.R. 848, 853 (Bankr. N.D. Tex. 2005) (reaching this conclusion under Texas law).

The contrary argument Trinity and Polyset advance – that the claims filed against Zinc in the four products liability actions extended the wind-up period in such a way as to permit Zinc to file bankruptcy in 2006 – is incorrect. When an action is filed against a corporation during the wind-up period, section 278 says the corporation continues beyond that period "solely for the purpose of such action." Del. Code Ann. tit. 8, § 278. Otherwise, once the three-year period has ended, the corporation can neither sue nor be sued. *See Citadel*, 423 A.2d at 503. Zinc's existence may have continued for purposes of the products liability actions themselves, but the filing of those actions could not extend the life of the corporation for any other purpose. When the wind-up period ended, Zinc was well and truly dissolved – if it dissolved properly in 2000.

But did Zinc properly dissolve? The answer is unclear. Delaware provides two methods for voluntary corporate dissolution. *See generally* 2 R. Ward, E. Welch, & A. Turezyn, *Folk on the Delaware General Corporation Law* §§ 274.1-275.3 (4th ed. 2006); S. Lamb & R. Glen, *The 1987 Delaware Law of Voluntary Corporate Dissolution*, 13 Del. J. Corp. L. 11, 14-16 (1988). Under the first, section 275, the majority of directors must adopt a resolution calling for dissolution, notify all shareholders, and then hold a meeting at which the shareholders vote on the proposal. Del. Code Ann. tit. 8, § 275(a). A majority of sharcholders must then vote for

dissolution. Del. Code Ann. tit. 8, § 275(b). Dissolution can also be achieved under section 275 without action of the directors if all shareholders consent to dissolution in writing. *See* Del. Code Ann. tit. 8, § 275(c). In either case, a certificate of dissolution must be filed with the Secretary of State containing the information and making the representations described in section 275(d). *See* Del. Code Ann. tit. 8, §§ 275(a), (c).

The second dissolution method, section 274, is available only if a corporation has not issued shares or has not commenced business. *See* Del. Code Ann. tit. 8, § 274. If one of those conditions is satisfied, a majority of incorporators or a majority of directors (if there are directors) may surrender the corporation's rights by filing with the Secretary of State a certificate stating either that no shares have been issued or that no business has been commenced, and making other required representations. *Id.* The certificate must be acknowledged by a majority of incorporators or directors and must be filed with Secretary of State. *Id.*

On December 29, 2000, Zinc delivered a certificate of dissolution to the Secretary of State who filed the certificate in accordance with section 103(c). But the certificate purported to dissolve the corporation under section 274, not section 275. Zinc was not authorized to dissolve under section 274 because it had begun business *and* issued shares. Zinc was able to have a section 274 certificate filed only by falsely stating in the certificate that "no shares of the stock of the corporation have been issued." Moreover, the certificate was signed by a Catherine M. Leonard who purported to represent the majority of incorporators. But whether Ms. Leonard was really an incorporator is doubtful. Although she signed Zinc's original certificate of incorporation, the Secretary of State's records contain a 1995 "certificate of correction" signed by one Lee Marie Labazzo who represented that she was Zinc's "sole incorporator."

Delaware law says nothing about the legal effect of filing a false certificate of dissolution

and dissolving under the wrong statutory section. No statutory provision or judicial decision addresses the question. Secondary Delaware sources that discuss how strictly a corporation must comply with the dissolution provisions of the General Corporation Law offer only unhelpful platitudes. *See* 1 D. Drexler, L. Black, & A. Sparks, *Delaware Corporation Law & Practice* § 38.02 at 38-4 (2005) (stating simply that a "lawful dissolution of a corporation can be effectuated only pursuant to a conscious following of the statutory procedure"); 1 F. Balotti & J. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 10.13 at 10-40 (2002) (asserting without citation or explanation that "the procedures for dissolving a corporation . . . must be closely followed").

Further complicating matters is the corrected certificate that Gregg Falberg filed in September 2006. Delaware does permit corrections of this kind, as the Attorney General observed in his letter. When an instrument is filed with the Secretary of State and the instrument is not an accurate record of the corporate action the instrument describes, section 103(f) of the General Corporation Law allows the instrument to be corrected by filing a certificate of correction describing the inaccuracy and setting forth the corrected version of the inaccurate portion. *See* Del. Code Ann. tit. 8, § 103(f). The correction can also be accomplished simply by filing a corrected instrument. *Id.* Either way, the correction is "effective as of the date the original instrument was filed." *Id.*

But there is some question whether Falberg could take this kind of action in his capacity as a director or officer of Zinc following the bankruptcy filing. A bankruptcy trustee displaces the management of a corporate debtor and assumes management's powers. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 351-53 (1985) (noting that in a chapter 7 case the debtor's directors are "completely ousted" by the trustee); *In re ANR Advance Transp.*

*Co.*, 302 B.R. 607, 614 (Bankr. E.D. Wis. 2003). It is true that Falberg was also a shareholder of Zinc, and shareholders (as opposed to management) retain some post-petition rights of "corporate governance." *See Official Bondholders Comm. v. Chase Manhattan Bank (In re Marvel Entm't Group, Inc.)*, 209 B.R. 832, 838 (D. Del. 1997). But whether "corporate governance" includes the power to dissolve the corporation post-petition – especially where, as here, the dissolution would be retroactive, calling into question the corporation's ability to be a debtor and potentially causing the bankruptcy itself to fail – is an issue on which the case law sheds no light.

Given these difficult issues, issues only some of which the parties have briefed, Waxler's dissolution argument does not present a satisfactory basis for dismissing the bankruptcy case.

### b. The Best Interests of Debtors and Creditors

Waxler's second argument, on the other hand, is thoroughly persuasive. Even if the corporation still exists, it has long since ceased doing business, and its estate has no assets. There is no reason to have a bankruptcy case except to maintain four large products liability actions in Illinois. The debtor and creditors alike will be better served if the case is dismissed.

Corporate chapter 7 cases serve a limited purpose. Because the debtor receives no discharge, the "fresh start" policy of the bankruptcy laws is not involved. *In re American Telecom Corp.*, 304 B.R. 867, 869 (Bankr. N.D. Ill. 2004). The only purpose of the case is to permit the fair and orderly liquidation of corporate assets, "and a no-asset Chapter 7, of course, does not implicate this policy." *Id.* at 870. A corporate chapter 7 case with an empty estate, one where the debtor wound up years earlier, benefits neither the debtor nor its creditors, serves no legitimate purpose, and is properly dismissed under section 305(a)(1). *See In re Deacon Plastics Mach., Inc.*, 49 B.R. 982, 984 (Bankr. D. Mass. 1985) (dismissing chapter 7 case where debtor

had "no assets . . . [and] no possibility of obtaining any in the future"); *cf. Mother African Union Methodist Church v. Conference of AUFCMP Church (In re Conference of AUFCMP Church)*, 184 B.R. 207, 218 (Bankr. D. Del. 1995) (dismissing chapter 7 case under section 105(a) where debtor had no assets and case made "no sense in terms of bankruptcy policy").

There is little question that Zinc's bankruptcy estate has no assets. The petition and schedules list nothing, and small wonder: Gregg Falberg testified that Zinc sold its assets almost a decade ago to Valspar, and those sale proceeds not distributed immediately to shareholders were paid to them out of escrow in 1998 and 1999. So Zinc has no cash, and if it ever had any real or personal property in the estate that could be sold to benefit creditors, it has none now. The chapter 7 trustee also appears to have concluded there are no avoidance actions or other bankruptcy causes of action she can pursue to recover property for the estate. For its part, Trinity and Polyset have not claimed the petition and schedules are erroneous, have not located any cash or real or personal property to be liquidated, and have not identified any avoidance or other actions for the trustee to bring. As the trustee remarked succinctly at the last status hearing, this is "a case that has nothing in it."

Trinity nevertheless insists that the estate contains a valuable asset, one that gives the bankruptcy case a *raison d'être*. Trinity argues that when Zinc dissolved, it failed to comply with sections 280 or 281 of the Delaware General Corporation Law, Del. Code Ann. tit. 8, §§ 280-81. Those provisions require a dissolving corporation to establish a security arrangement for the payment of certain future claims – either an elective procedure under sections 280 and 281(a) or the default procedure under section 281(b). *See generally In re RegO Co.*, 623 A.2d 92, 97-98 (Del. Ch. 1992); R. Schnall, *Extending Protection to Foreseeable Future Claimants through Delaware's Innovative Corporate Dissolution Scheme – In re RegO Co.*, 19 Del. J. Corp. L. 141,

149-54 (1994). Because Zinc did not comply with either section, Trinity argues that the corporation has a claim for breach of fiduciary duty against Zinc's directors and officers, one the chapter 7 trustee can bring for Trinity's benefit and the benefit other creditors.

Trinity's argument runs into several problems. Chief among them is that this newfound asset – a cause of action for Zinc's failure to set up a post-dissolution mechanism for payment of claims – depends on Zinc's corporate dissolution in 2000: if Zinc did not dissolve, after all, it had no obligation to create such a mechanism and so could not have violated sections 280 or 281. But if Zinc *did* dissolve in 2000, then (for reasons discussed earlier) it had no power to file bankruptcy in 2006, and the bankruptcy would have to be dismissed for that reason. So Trinity's argument is self-defeating. Either Zinc did not dissolve, in which case there is no such asset and the case should be dismissed, or Zinc did dissolve, in which case it could not have filed bankruptcy and the case should be dismissed.

Even if an escape from this logical trap were possible, the asset Trinity identifies would not warrant continuation of the bankruptcy case. The cause of action is not only contingent but doubly so. Before the trustee could pursue it, Trinity would have to be found liable to the plaintiffs in the products liability actions, and Zinc would then have to be found liable to Trinity on the various cross-claims and third-party complaints. Until those contingencies occurred, Trinity would have no rights against Zinc and so could have sustained no damage from the failure of Zinc's officers and directors to provide for future claims. Neither of these contingencies has occurred yet, though. They may never occur.

Should they occur, moreover, and should a breach of fiduciary duty claim arise, Trinity would not need a bankruptcy trustee to pursue the claim. Under Delaware law, directors and officers of a dissolving corporation owe a fiduciary duty, not just to the corporation's

shareholders, but also to its creditors. *Gans v. MDR Liquidating Corp.*, Civ. No. 9630, 1990 WL 2851, at *9 (Del. Ch. Jan. 10, 1990). When no provision is made under sections 280 and 281 for payment of future claims, creditors therefore have their own cause of action for breach of fiduciary duty. *Id.*; *see also Akande v. Transamerica Airlines, Inc. (In re Transamerica Airlines, Inc.)*, No. Civ. A 1039-N, 2006 WL 587846, at *7-9 (Del. Ch. Feb. 28, 2006); *Kidde Indus., Inc. v. Weaver Corp.*, 593 A.2d 563, 565-66 (Del. Ch. 1991). Trinity can pursue the claim itself.

When the only asset of a bankruptcy estate is a lawsuit, particularly one that creditors themselves can pursue, no purpose is served in keeping the bankruptcy case alive so a trustee can prosecute the lawsuit for them. *In re Cincinnati Gear Co.*, 304 B.R. 784, 786 (Bankr. S.D. Ohio 2003) (dismissing a case under section 305(a)(1) that appeared "to be a no asset case with the exception of alleged actions that creditors may pursue, and are pursuing, in state court"). The estate will simply incur massive administrative costs, costs that will reduce the creditors' eventual recovery. *See Jr. Food Mart*, 241 B.R. at 427 (noting that when the only estate asset is litigation, the litigation "serves to create administrative costs unduly burdensome to the estate"). Trinity would be far better off pursuing its breach of fiduciary duty claim outside of bankruptcy.

Because the bankruptcy estate has no assets from which to pay creditors, the question becomes why Trinity and Polyset are so eager to keep the bankruptcy case alive. The only plausible answer is that they need the case to provide a new venue for the four products liability actions, a venue 900 miles north of Louisiana and its courts. When the bankruptcy case unexpectedly provided a federal jurisdictional "hook," Trinity removed the actions to federal court the next day (with Polyset following suit soon after). Trinity then promptly – and successfully – moved to have the actions transferred to Chicago. In the interim, Trinity and Polyset have spent months in this court fighting to keep the bankruptcy case pending. But with a

defunct debtor, no assets, and no possibility of payment to creditors, the sole reason for fighting that fight must be to keep the products liability actions here rather than in Louisiana.

That is not reason enough for there to be a bankruptcy case. The case must have its own justification for being, one related to some legitimate bankruptcy policy or purpose. A bankruptcy case filed or maintained purely for some party's procedural ends, one having no purpose cognizable under the bankruptcy laws, should be dismissed under section 305(a)(1). *See, e.g., Spade,* 258 B.R. at 233 (dismissing an involuntary case in part because the petition was filed to "control the forum in which . . . [a state court] court dispute could be heard and to gain a litigation advantage over [the debtor]"); *Jr. Food Mart,* 241 B.R. at 427 (observing that "dissatisfaction with another court's rulings . . . is not a reason to file a bankruptcy case"); *AUFCMP Church,* 184 B.R. at 223 (dismissing a case that had "only served to delay and frustrate legitimate state court proceedings").

None of this is particularly meant to fault Trinity, Polyset, or their counsel for the removal and transfer. Trinity and Polyset did not file the bankruptcy, nor did they somehow manufacture a basis of federal jurisdiction for what had been Louisiana state court litigation. Zinc filed the bankruptcy for its own strange ends; presented with that opportunity, Trinity and Polyset simply did what the law permitted them to do. That the removal and transfer were permissible, however, is not a reason to maintain this bankruptcy case.[2]

---

[2]    Waxler alleges that Trinity played the jurisdictional card because it was doing poorly in the Louisiana actions. Trinity strenuously denies any such motivation (though it does not deny Waxler's version of how things were going for it in Louisiana). But it would make no difference if Trinity had been doing well in the Louisiana courts and then for some other reason – that Chicago happens to be a "toddlin' town," say – had decided to remove the Louisiana actions and have them transferred here. The point is that an otherwise needless, no-asset corporate chapter 7 bankruptcy case cannot be maintained purely to provide a venue for major civil litigation from another jurisdiction – the tiny tail on an enormous dog.

To sum up, the interests of all parties will be better served if this case is dismissed. Zinc will be better served because it has no need of the bankruptcy, never had any need of it, and wants it dismissed. No one has explained how the continuation of the case will benefit Zinc. Dismissal will also better serve creditors because the estate has no assets and creditors will receive nothing if the case continues. The only asset anyone has identified is a theoretical cause of action that depends on Zinc's dissolution and so would preclude a bankruptcy case if it existed. The cause of action is in any event a state law claim that creditors could assert for themselves outside of bankruptcy, avoiding administrative costs. With no assets in the estate and nothing for the trustee to do, this bankruptcy case has no legitimate purpose. Its only purpose -- an illegitimate one – is to keep major civil litigation in a Chicago federal court that properly belongs in the state courts of Louisiana. The case should be and will be dismissed.

### 3. Conclusion

For these reasons, the amended motion of International Zinc Coatings & Chemical Corp. to dismiss its chapter 7 case is granted. This case is dismissed pursuant to 11 U.S.C. § 305(a)(1). All other pending motions are denied as moot. A separate order will be entered in accordance with this opinion.

Dated: November 17, 2006

A. Benjamin Goldgar
United States Bankruptcy Judge

NOV 17 2006